UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| CENTURY ALUMINUM OF SOUTH CAROLINA, INC. | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. _2:17_-cv-274-RMG |
| v. | ) ) | |
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Century Aluminum of South Carolina, Inc. ("Century"), by and through its undersigned counsel, brings this action against Defendant South Carolina Public Service Authority ("Santee Cooper") for injunctive relief, costs of suit, and treble damages under the antitrust and unfair competition laws of the United States and the State of South Carolina for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the South Carolina Antitrust Act, S.C. Code Ann. §§ 39-3-10 and 39-3-130, and the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20. Based upon personal knowledge and information and belief, Century alleges as follows:

### NATURE OF THE CASE

1. This is an antitrust action against Santee Cooper, a monopolist in the sale and transmission of electric power to end-user customers. The action is brought by a customer—one of the last remaining aluminum producers in the United States—whose operation is now in jeopardy due to Santee Cooper's unlawful efforts to maintain its monopoly and its resulting monopoly prices, which are the highest power costs charged to any aluminum smelter in the

United States on a net basis. The most expensive input to aluminum smelting—even more expensive than the raw ingredients—is electric power. Indeed, in the past decade the majority of domestic aluminum producers have ceased operations due in part to high power costs. But Century's plant in Mt. Holly, South Carolina has operated in the region for decades, employed thousands of South Carolinians and contributed hundreds of millions of dollars to the regional economy. This contribution, along with the ongoing operation of the Mt. Holly facility, is now jeopardized by Santee Cooper's unlawful efforts to maintain its monopoly.

2.      In its service area, as defined in S.C. Code Ann § 58-31-330, which comprises portions of Berkeley, Georgetown, and Horry Counties, South Carolina ("Service Area"), Santee Cooper, an electric utility, has monopoly power over both the sale and the transmission of electric power to end-user customers, per S.C. Code Ann § 58-31-310. Santee Cooper owns 100% of the transmission lines in its Service Area, which cannot be practically duplicated. Santee Cooper acquired its monopoly over both the transmission and the sale of electric power in its service area long ago; however, Santee Cooper's efforts to maintain its monopoly power and prevent price competition have grown increasingly bold and aggressive.

3.      Century does not allege that Santee Cooper acquired its monopoly power improperly. What Century does challenge is Santee Cooper's maintenance of its monopoly through anticompetitive conduct. Specifically, and with anticompetitive intent, Santee Cooper has refused to deal with Century and numerous third-party suppliers of electric power who have offered to sell power for Century at substantially lower prices, and unlawfully tied transmission services for third-party electric power to Century's purchase of Santee Cooper-generated electric power at monopoly rates.

2

4.     Santee Cooper's transmission lines that run into and throughout its service area are the only means for delivering third-party electric power to Century and other customers.  While third-party providers of electric power offer significantly lower prices than Santee Cooper, none of them have the ability to deliver any of that electric power to Santee Cooper customers unless Santee Cooper provides transmission services on its transmission lines.  Santee Cooper has steadfastly refused to provide lower-priced electric power suppliers with access to Santee Cooper transmission lines unless Century agree to Santee Cooper's unlawful demands noted herein.

5.     Santee Cooper has maintained this posture—severely limiting end-user access to third-party sources of electricity—despite the consistent excess capacity on Santee Cooper's transmission grid.  In other words, Santee Cooper controls the only available transmission lines in its Service Area and does not fully utilize those lines.  Meanwhile, Santee Cooper refuses to allocate sufficient transmission capacity to lower-priced third-party providers who are otherwise capable of meeting all of Century's electricity needs.

6.     This refusal on Santee Cooper's part has already forced Century to significantly curtail aluminum production and lay-off hundreds of employees in South Carolina, reducing economic activity in the region by hundreds of millions of dollars.  Unless Santee Cooper's anticompetitive conduct is stopped, Century will ultimately be forced to close the entire facility.  In practice, once an aluminum smelter is shut down, the costs of restarting mean that it cannot practically be reopened.

7.     During the times pertinent to this Complaint, Santee Cooper has unreasonably and unlawfully refused to allow delivery of third-party electric power to Century unless Century agreed to the condition that it purchase a significant portion of its power requirements from Santee Cooper at monopoly prices, which are the highest charged to any United States smelter

and have increased considerably in the past several years, or pay hundreds of millions of dollars in penalties to Santee Cooper.  Santee Cooper's unlawful tying requirements and penalties are so significant that it has eliminated the economic value of obtaining power from third-parties.

8.     Specifically, Century has been required to purchase a minimum of 25% of its power from Santee Cooper at supra-competitive prices—which were significantly higher than the market prices at all times pertinent to this Complaint—in order for Santee Cooper to allow power from lower-cost third-party providers to be delivered over Santee Cooper's transmission lines to Century.

9.     The resulting elevated costs to Century have forced it to shut down half of its Mt. Holly facility, resulting in the loss of over 200 jobs (41% of its work force) at the Mt. Holly plant and approximately $450 million/year of lost economic benefit to South Carolina.  Indeed, Century is a key contributor to the local economy, providing much needed jobs, tax revenue, and charitable donations to the community.  Still, Century must compete with other aluminum smelters around the country, all of whom pay significantly lower prices for electric power.

10.     Santee Cooper has not offered any credible justification for denying Century's request for access to additional third-part supply of electric power.  While Santee Cooper claims that reserving import capacity for Mt. Holly *may* cause it to forego market purchases that it would otherwise make, this claim is contradicted by Santee Cooper's own admission that there is sufficient existing, unreserved import capacity to serve Mt. Holly's entire load.  This claim is further contradicted by Santee Cooper's own rate study for 2016-2018, and in longer-term forecasts presented by Santee Cooper management to its Board, acknowledging that Santee Cooper does not intend to increase its market purchases.

11.     Santee Cooper has consistently evidenced its anticompetitive intent by engaging in bad faith and discriminatory conduct during discussions regarding a new contract with Century.  For example, Santee Cooper informed Century at one point that it could only use Santee Cooper's transmission network to import Century's electric power requirements from a third-party if Century paid Santee Cooper over $200 million to duplicate the necessary transmission lines. Later, Santee Cooper's President and Chief Executive Officer, Lonnie N. Carter, admitted that no new infrastructure was needed and would not be built even if Century made the $200 million payment, and thus the $200 million "offer" was a merely flat refusal under another guise.

12.     Through its anticompetitive conduct, Santee Cooper has illegally maintained its monopoly and preserved its monopoly prices, costing Century millions of dollars in higher electric power costs, as well as forcing the partial closure of the Mt. Holly facility and associated loss of jobs cited above.

13.     If Santee Cooper's anticompetitive behavior continues, it will ultimately force the permanent closure of Century's entire aluminum smelting facility in Mt. Holly, South Carolina.

14.     If Century is forced to close its plant, Santee Cooper's illegal conduct will be directly responsible for eliminating hundreds of jobs, and will result in the loss of hundreds of millions of dollars in economic impact to the State of South Carolina, even though Santee Cooper's Board of Directors is expressly directed by S.C. Code Ann. § 58-31-55(A) to consider the effect its decisions would have on "job attraction and retention" in Santee Cooper's service area.

15.     Through this Complaint, Century seeks relief under the federal and state antitrust laws, as well as the common law, from Santee Cooper's anticompetitive and tortious conduct designed to unlawfully restrict Century's choices with regard to power supply, injure competition for the

supply of electric power, and interfere with Century's ability to contract for the sale and transmission of electric power at competitive prices that would ensure Century's viability.

16.     Santee Cooper's anticompetitive behavior protects the utility from any outside power competition and imposes higher electric power costs on Century.  Santee Cooper's monopoly power over the sale and transmission of electric power and the anticompetitive exercise of that power is without any meaningful oversight or regulation by the state.

17.     This complaint by Century is the company's only recourse, given the lack of any alternative venue or means by which to obtain relief through the government.

## THE PARTIES

18.     Plaintiff Century, a South Carolina corporation, owns and operates a primary aluminum reduction facility in Mt. Holly, South Carolina, which employs approximately 600 individuals at full operation and produces an annual economic benefit to South Carolina of hundreds of millions of dollars.

19.     Defendant Santee Cooper was created by S.C. Code Ann. §§ 58-31-10 et seq. and is engaged in the business, among other things, the sale and transmission of electric power to Century and to others.

## JURISDICTION AND VENUE

20.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. § 22, because this action seeks damages and injunctive relief to remedy, prevent, and restrain violations of §1 and §2 of the Sherman Act, within the meaning of 15 U.S.C. §§ 15, 26. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Century's claims under South Carolina State law because the claims are so related to the federal claims in the action that

they form part of the same case or controversy under Article III of the United States Constitution.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. §§ 22, 26, because Century is a resident of this District and the Defendant's conduct as alleged took place, and continues to take place, in this District.

<strong>RELEVANT MARKET</strong>

22.    The relevant antitrust markets are (1) the market for the transmission of electric power and (2) the market for the sale of electric power to end-user customers.

23.    The relevant geographic market is Santee Cooper's service area, as defined in S.C. Code Ann § 58-31-330, which comprises portions of Berkeley, Georgetown, and Horry Counties, South Carolina ("Service Area").

<strong>FACTUAL ALLEGATIONS</strong>

<strong>Background Regarding Santee Cooper and Electric Power Markets</strong>

24.    Santee Cooper generates and transmits electric power to end-user residential, commercial and industrial customers in South Carolina, and has done so since 1942.  Santee Cooper is a monopolist in the sale and transmission of electric power in its Service Area, currently providing 100% of the transmission and ultimate sale of electric power in its Service Area.

25.    Santee Cooper transmits electric power to customers primarily by way of its network of transmission lines into and throughout its Service Area.  These transmission lines provide the only means of importing and delivering electric power to Century.

26.    Santee Cooper serves more than 165,000 residential, commercial, and industrial retail customers with energy supplied from coal, nuclear, oil, natural gas, hydro and some renewable energy and purchased power.  Santee Cooper owns and operates the generation facilities as well as the means of transmitting electric power to its customers.  Santee Cooper also transmits

electric power to wholesale customers under Santee Cooper's Open Access Transmission Tariff ("OATT"), as provided by federal law.

27.     For customers of Santee Cooper, multiple alternative suppliers of electric power exist; however, all such alternative suppliers are entirely dependent on Santee Cooper's transmission lines to service end-user customers in Santee Cooper's Service Area.  In that way, Santee Cooper's transmission lines represent an essential facility for delivering electric power to end-users in the Service Area.  Absent access to those transmission lines, alternative suppliers of electric power cannot supply such power in the Service Area.

28.     Nothing in the South Carolina Code authorizes Santee Cooper's anticompetitive behavior; nor is that behavior actively supervised by the State of South Carolina.

### Santee Cooper's Structure and Independence

29.     Santee Cooper is not a traditional utility.  Santee Cooper operates independently of the state; its services and rates are not subject to approval by the state Public Service Commission or any other state agency.  Santee Cooper is financially independent of the state; it does not receive funding from the South Carolina Treasury.  Santee Cooper does not submit a budget to any state agency for approval; instead, each year Santee Cooper provides an annual budget estimate to the South Carolina House Ways and Means Committee "for information purposes only."  S.C. Code Ann. § 58-31-400.

30.     No state agency actively supervises Santee Cooper's conduct or its rates.  For example, no agency conducts regular audits or investigations of Santee Cooper's conduct or its rates or, indeed, issues any regular reports about any aspect of Santee Cooper's business.

31.     In nearly every respect, Santee Cooper acts and operates as a private corporation.  While its Board is appointed by the Governor, only two Board members have limited expertise in the

power industry. Importantly, unlike the state Public Service Commission which regulates investor-owned utilities, no internal Santee Cooper staff or outside experts directly advise the Board on customer service and rate issues independent of utility management's views. Board members can also only be removed "for cause." The Board relies wholly on management and exercises its responsibilities to establish services and rates without any state oversight or regulation. In practice, Santee Cooper operates as an unregulated public utility without any active state supervision, and there is no relevant difference between Santee Cooper's structure and governance and other private entities governed by a board of directors.

### The History of Century's Mt. Holly Smelting Facility

32.    Century's Mt. Holly facility opened in 1979 under the ownership of Alumax, Inc. ("Alumax"). In 1987, a predecessor company of Century purchased a 26.7% interest in the Mt. Holly facility. In 1998, Alcoa, Inc. ("Alcoa") acquired Alumax and its share in the Mt. Holly facility. Shortly thereafter, Century acquired an additional 23% interest in the facility, bringing its total ownership to 49.7% of the facility. Century's ownership interest increased to 100% on November 30, 2014.

33.    Throughout Century's ownership, the Mt. Holly facility has been an active and important contributor to the local economy, employing hundreds of South Carolina residents, paying significant property and income taxes, generating hundreds of millions of economic impact and making meaningful donations to local charities.

34.    Aluminum smelting is an energy intensive process and the viability of aluminum smelting is closely tied to the cost of electric power. Even though the Mt. Holly facility is one of the most energy efficient aluminum smelters in the United States, the net power costs to Mt. Holly due to Santee Cooper's anticompetitive behavior are the highest power costs of any aluminum smelter in the United States. Because of Santee Cooper anticompetitive rates, the Mt.

Holly facility was forced to cut production in half in 2015, laying off approximately 200 employees.

### Events and Discussions between Century, its predecessor in interest—Alcoa—and Santee Cooper

35.    In 2010, Santee Cooper entered a five year service contract for the sale and transmission of electric power to the Mt. Holly facility.  The new contract had a term through December 31, 2015.  The contract denied the Mt. Holly facility access to any lower-priced alternative power suppliers via Santee Cooper's transmission network.  Given the lack of any alternative source of electric power, the Mt. Holly facility had no choice but to agree to the contract.

36.     Santee Cooper's rates continued to be much higher than the prices of available third-party providers and also higher than electric power prices available to other U.S. smelters.  In 2011, for example, the Mt. Holly facility was paying Santee Cooper an average power rate of that was over 50% higher than the competitive rate—putting the plant at a significant cost disadvantage relative to its competitors.

37.    Santee Cooper modified the supply contract for the Mt. Holly facility in June 2012. Santee Cooper continued to refuse to deal with third-party providers of electric power, and allow them transmission access, unless the Mt. Holly facility agree to the condition that it purchase 25% of its electric power requirements from Santee Cooper-owned generation at monopoly prices.  Ultimately, Mt. Holly had no choice but to agree.  Under the contract, Santee Cooper agreed to purchase 300 MW of electric power from a third party and then deliver and re-sell this electric power to Mt. Holly.  The relevant third-party producer delivered its electric power to Santee Cooper's transmission border.  Santee Cooper then purchased the power and resold it to the Mt. Holly facility, which assumed all the pricing risk.  Mt. Holly continued to purchase 25% of its load at Santee Cooper's monopoly prices, per Santee Cooper's demand.

38.    The result of the 25% requirement was that the net electric power costs to Century's Mt. Holly facility remained the highest power price paid by any United States smelter, which rendered it uncompetitive.

**Defendant's Anticompetitive Conduct**

39.    On December 19, 2014, Century informed Santee Cooper that if it could not acquire electric power at a competitive rate, it may be forced to cease operations.

40.    Around the same time, Century requested proposals from third parties to supply all of Century's power needs (400 MW) at market-based rates for five years beginning January 1, 2016.  Seven electric power suppliers responded with offers to supply Century with all or part of the requested power at rates that were significantly lower than Santee Cooper's.

41.    In April 2015, Century proposed to Santee Cooper that a third-party provider supply all of Mt. Holly's required 400 MW of electric power.  Century offered to pay Santee Cooper a transmission charge for delivery of this power to the Mt. Holly facility at the same rate that wholesale customers paid for the same services under Santee Cooper's OATT, as provided by federal law and accepted by the FERC.  This offer amounted to approximately $13 million in transmission revenue per year for Santee Cooper.

42.    Under the OATT, Santee Cooper must offer unreserved transmission capacity on a non-discriminatory basis to wholesale customers; and in considering a transmission request, Santee Cooper cannot give a preference to a power sale from Santee Cooper generation.  Santee Cooper is also not permitted to hold back unreserved capacity on the expectation that it might make short-term market purchases for its own account.  The purpose of the rule is to separate the transmission business from the power business.  While the OATT does not protect Century, a retail customer, it does illustrate a long-standing principle that public utilities may not preference

their own electric power. Santee Cooper has been violating this principle in its efforts to maintain its monopoly power over Century.

43. In April 2015, Century also began negotiations with a specific third-party electric power supplier ("Third-Party Provider") on a five year contract to supply the Mt. Holly facility with 400 MW of electric power. On July 16, 2015, Century and the Third-Party Provider signed a letter of intent with a detailed term sheet specifying the price, terms and generation resources by which the Third-Party Provider would supply Century with 400 MW for delivery to Santee Cooper's transmission border for 5 years starting January 1, 2016.[1]

44. The Third-Party Provider requested 400 MW of firm transmission from its generation over the Duke and Southern Company transmission systems for delivery to the Santee Cooper transmission system for the five year term. Duke and Southern Company confirmed the availability of unreserved transmission to meet this request.

45. The price of the third-party electric power, plus Santee Cooper's transmission charges, would have ensured the Mt. Holly facility's long-term viability. Santee Cooper refused to meet with the Third-Party Provider or to allow the associated transmission for the 400 MW on its system.

46. On July 30, 2015, Santee Cooper said it would import and deliver the 400 MW of third-party electric power to Mt. Holly only on the condition that Century pay Santee Cooper $202 million, the purported cost of duplicating Santee Cooper's existing surplus transmission line capacity that would be used to import and deliver the 400 MW of third party power. Such duplication would have required years of effort and was entirely unnecessary, given the fact that

---

[1] Santee Cooper would not sign a purchase power contract for resale to Mt. Holly with a third-party supplier, but only with a Century affiliated entity. Accordingly, Century created "Century Marketer LLC" which is wholly owned by Century and is authorized by FERC to purchase power and sell power at market prices.

Santee Cooper was only utilizing a portion of its existing transmission capacity. This outrageous proposal made the third-party electric power uncompetitive and unrealistic. Santee Cooper knew that this proposal would be impossible for Century to accept, as was thus a thinly guised flat refusal to deal.

47.    On September 30, 2015, Santee Cooper's President and Chief Executive Officer Lonnie N. Carter admitted in a meeting with Century that there was sufficient existing surplus capacity on the Santee Cooper transmission facilities to import and deliver 400 MW to Mt. Holly, and that even if Century paid the $202 million "replacement cost," the payment would not be spent to construct any additional facilities. This statement expressly contradicted Santee Cooper's prior justifications for its refusal, and left Santee Cooper without any legitimate reason for refusing Century's request.

48.    In addition, a Santee Cooper 2015 Rate Study, and numerous reports by Santee Cooper management, confirms that there was sufficient unused transmission capacity available to import the 25% of additional third-party electric power that Century needed to remain viable.

49.    Century and the Third-Party Provider were prepared to sign a definitive contract for a 5-year supply of 400 MW of firm electric power starting January 1, 2016. However, Santee Cooper blocked their efforts by flatly refusing to import and deliver the last 100 MW of market power from the Third-Party, and instead demanded that Century purchase 100 MW of Santee-generated power at Santee Cooper's monopoly rates.

50.    Based on Santee Cooper's refusal to deal, Century was forced to shut down half of Mt. Holly's operations, resulting in the loss of hundreds of jobs in the State of South Carolina and hundreds of millions of dollars of economic impact throughout the state.

51.    On November 4, 2015, after deciding to shut down half of its Mt. Holly operations, Century submitted another proposal to acquire from a third party only the remaining 200 MW needed to supply the now half-shuttered plant.  The requested amount was 100 MW less than Santee Cooper had already agreed to allow Century to import.  Even though it admittedly had more than sufficient capacity, Santee Cooper remained insistent that, as a condition of any access to market power, Century must purchase at least 25% of its load from Santee Cooper at its monopoly rate, regardless of the total amount of market power acquired or transmission access needed.

52.    In December 2015, having no other choice in order to keep at least a portion of the Mt. Holly facility operating, Century was forced to accede to Santee Cooper's demand for a 25%/75% power supply split which Santee Cooper imposed in its new rate schedule for Customer Supplied Power, CSP-16.  Under this agreement, Century pays Santee Cooper transmission fees to deliver 150 MW of third-party power, and demand and energy charges for 50 MW of Santee-generated power (at rates that are significantly above market).  Santee Cooper increased its monopoly rate for the 50 MW of Santee-generated power on January 1, 2017 by approximately 10%.

53.    Throughout the process, Century lacked recourse to any ultimate authority higher than Santee Cooper itself.  Neither the State Public Service Commission nor FERC has jurisdiction over Santee Cooper's retail services or rates.  Santee Cooper has sole authority over its business dealings, including the ultimate terms of any agreement with Century.

54.    Century remains imperiled by Santee Cooper's tying of two distinct products—the sale of transmission services for electric power and the sale of electric power itself.

## HIGH ENTRY BARRIERS

55.     Regulatory barriers to entry limit competition in the markets for the sale and transmission of electric power in Santee Cooper's Service Area.  Santee Cooper has a monopoly on the transmission of electric power to end users in in that area.  Replication of the transmission facilities is prohibitively expensive given that they cover hundreds of miles of Santee Cooper's Service Area.  The extreme expense, and the significant regulatory hurdles, is the reason that no one has attempted it.

56.    As a monopolist over relevant transmission lines, Santee Cooper is the exclusive gatekeeper of any entry of third-party electric power into Santee Cooper's Service Area.  As explained above, this monopoly power gives Santee Cooper the ability to block or severely limit such entry.

## INJURY TO COMPETITION, CONSUMERS, AND CENTURY

57.    As a result of Santee Cooper's anticompetitive conduct, Century has paid millions of dollars in artificially elevated electric power costs which directly resulted in the closure of half of its Mt. Holly facility.

58.    Today, those escalated costs are an existential threat to Century.  The company simply cannot afford to operate its Mt. Holly facility at the present electric power rates required by Santee Cooper.  Without access to more competitively priced electric power, the entire Mt. Holly facility will ultimately be closed, resulting in the loss of hundreds of jobs and hundreds of millions of dollars of economic impact in the State of South Carolina.  After the closure, Santee Cooper's customers will also be harmed by Santee Cooper's loss of significant transmission revenue from Century.

59.     Santee Cooper has no legitimate business justification for its anticompetitive conduct, and throughout this process has asserted only false or pre-textual reasons for its actions.  Customers do not benefit and competition is impaired.

## COUNT 1: ILLEGAL TYING IN VIOLATION OF 15 U.S.C. § 1 AND 2, AND 15 U.S.C. § 14

60.     Century re-alleges and incorporates by reference paragraphs 1 through 59 as if fully set forth herein.

61.     Santee Cooper's requirements constitute agreements that unreasonably restrain trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

62.     The sale of electric power and the transmission of electric power are distinct and separate products, as acknowledged by Santee Cooper's OATT approved by the FERC.  Additionally, Santee Cooper's own contracts clearly state that the electric power provided by Santee Cooper to Century is "customer supplied" and clearly considered a distinct product from Santee Cooper's transmission of electric power.

63.     Santee Cooper is a monopolist for the sale and transmission of electric power to end-user customers in its Service Area.  Santee Cooper owns all of the transmission lines in its Service Area and generates the vast majority of the electric power delivered by way of those transmission lines.  Santee Cooper has used its control of relevant transmission lines as a tying product, which it uses to maintain its monopoly profits on the sale of electric power to end-user customers, which is the tied product.

64.      Santee Cooper has unnecessarily and unlawfully tied transmission services for non-Santee Cooper electric power to Century's purchase of at least 25% of its load from Santee Cooper's own generation plants at above-market rates.  Santee Cooper has exploited its market

power, forcing Century to pay electric power prices higher than Santee Cooper's competition. For example, under the terms imposed by Santee Cooper for calendar year 2017, Santee Cooper will force Century to purchase power from Santee Cooper–owned generation at a rate that is significantly higher than the price for delivered power purchased from the competitive market from Santee Cooper's competitors based on current natural gas prices.

65.     Despite the ability to collect fair, reasonable, and nondiscriminatory rates on the transmission of third-party electric power, Santee Cooper has artificially limited the quantity of electric power that any third party may provide to Century. Santee Cooper has, without justification, excluded third-party electric power suppliers from competing for a substantial portion Century's electric power demands.

66.     As a result of Santee Cooper's unreasonable restraint on customer choice, Century was forced to pay millions of dollars more on total energy costs during the relevant time period than if such restraint had not limited Century's electric power generation choice.

67.     Santee Cooper's actions are not justified by valid business reasons or lawful, pro-competitive efficiencies.

68.     Santee Cooper's unreasonable restraint of trade, through the unlawful tying of electric transmission to the purchase of Santee Cooper generated electric power, affects substantial volumes of interstate commerce.

69.     As a direct and proximate result of Santee Cooper's willful imposition of the unlawful tying arrangement, Santee Cooper has unreasonably limited Century's choice in electric power suppliers, causing significant financial harm to Century and unjust rewards for Santee Cooper.

70.     As a direct and proximate result of Santee Cooper's unlawful tying, Century continues to suffer irreparable injury.

71.     Santee Cooper's imposition and enforcement of these requirements is likely to continue if not enjoined.

### COUNT 2: MONOPOLY MAINTENANCE IN VIOLATION OF 15 U.S.C. § 2

72.     Century re-alleges and incorporates by reference paragraphs 1 through 71 as if fully set forth herein.

73.     Santee Cooper has a monopoly over the sale and transmission of electric power in the Service Area, as directed by Section 58-31-430 of the South Carolina Code, and enjoys all the benefits such market power creates.  Santee Cooper has engaged in anticompetitive conduct to maintain its monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

74.     Santee Cooper's transmission grid is an essential facility for marketers of electric power to reach customers located in its Service Area.  Santee Cooper has complete control over the transmission grid by virtue of its statutory right.

75.     Century, Third-Party Provider, and other potential third-party electric power suppliers are unable to practically or reasonably duplicate portions of the transmission grid necessary to deliver power to Century's Mt. Holly facility, both as a matter of law and as a matter of unreasonable expense.

76.     Neither the South Carolina Public Service Commission nor FERC have jurisdiction over Santee Cooper's retail services or rates.  Even if Century petitioned these agencies, they have no authority to compel Santee Cooper to provide transmission services to the Mt. Holly facility or its designated third-party supplier.

77.     Santee Cooper has engaged in the conduct herein, including refusing to provide lower-priced electric power suppliers with access to Santee Cooper transmission lines unless Century agree to Santee Cooper's unlawful demands, with the purpose of excluding third-parties from

supplying electric power, thereby maintaining monopoly profits on an arbitrary portion of the Mt. Holly facility's electric power supply.

78.    Each aspect of this behavior described above is anticompetitive conduct that itself violates the antitrust laws.  Further, each aspect of this behavior demonstrates Santee Cooper's anticompetitive intent.  In addition, each act has the purpose and effect of unlawfully maintaining and enhancing Santee Cooper's monopoly power.

79.    The conduct has harmed competition by controlling the terms by which competitors can compete for Century's business, thereby restricting access to Berkeley, Georgetown, and Horry counties by marketers attempting to serve Century's needs.

80.    Century has been harmed by Santee Cooper's refusal to deal in an essential facility through paying higher prices to Santee Cooper than available through third-party marketers. Century has suffered damages in an amount to be proved at trial.

81.    As a direct and proximate result of Santee Cooper's anticompetitive actions, Century continues to suffer injury.

82.    Santee Cooper's imposition and enforcement of these requirements is likely to continue if not enjoined

## COUNT 3: VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, § 39-5-20

83.    Century re-alleges and incorporates by reference paragraphs 1 through 82 as if fully set forth herein.

84.    The South Carolina Unfair Trade Practices Act ("UTPA") prohibits "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).  The UTPA provides for a private cause of action.  S.C. Code Ann.

§ 39-5-140(a).  Moreover, a party may recover attorney fees and treble damages for a "willful" violation of the UTPA. S.C. Code Ann. § 39-5-140(a).

85.     Santee Cooper has a monopoly over the sale and transmission of electric power in the Service Area, as directed by Section 58-31-430 of the South Carolina Code, and enjoys all the benefits such market power creates.

86.     Santee Cooper has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the practices described herein.

87.     Santee Cooper's actions constitute willful and intentional violations of the UTPA, and are capable of repetition.

88.     Santee Cooper's conduct proximately caused injuries to Century, and will continue to do so if not enjoined.

### COUNT 4: VIOLATIONS OF THE SOUTH CAROLINA ANTITRUST ACT, § 39-3-10

89.     Century re-alleges and incorporates by reference paragraphs 1 through 88 as if fully set forth herein.

90.     South Carolina's antitrust statute proscribes, inter alia, "arrangements, contracts, agreements, trusts or combinations . . . made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this State" and "that may lessen or affect in any manner the full and free competition in any tariff, rates, tolls, premium or prices in any branch of trade, business or commerce."  S.C. Code Ann. § 39–3–10.

91.     Santee Cooper's requirements constitute agreements that unreasonably restrain trade in violation of S.C. Code Ann. § 39–3–10.

92.     The sale of electric power and the transmission of electric power are distinct and separate products, as acknowledge by Santee Cooper's OATT approved by the FERC.  Additionally,

Santee Cooper's own contracts clearly state that the electric power provided by Santee Cooper to Century is "customer supplied" and clearly considered a distinct product from Santee Cooper's transmission of electric power.

93.     Santee Cooper is a monopolist for the sale of electric power and the transmission of electric power in its Service Area.  Santee Cooper owns all of the transmission lines in its Service Area and generates the vast majority of the electric power delivered by way of those transmission lines.   Santee Cooper has used its control of relevant transmission lines as a tying product, which it uses to maintain its monopoly profits on the sale of electric power, which is the tied product.

94.     Santee Cooper has unnecessarily and unlawfully tied transmission services for non-Santee Cooper electric power to Century's purchase of at least 25% of its load from Santee Cooper's own generation plants at above-market rates.  Santee Cooper has exploited its market power, forcing Century to pay electric power prices higher than Santee Cooper's competition.

95.     Despite the ability to collect fair, reasonable, and nondiscriminatory rates on the transmission of third-party electric power, Santee Cooper has artificially limited the quantity of electric power that any third party may provide to Century. Santee Cooper has, without justification, excluded third-party electric power suppliers from competing for a substantial portion Century's electric power demands.

96.     As a result of Santee Cooper's unreasonable restraint on customer choice, Century was forced to pay millions of dollars more on total energy costs during the relevant time period than if such restraint had not limited Century's electric power generation choice.

97.     Santee Cooper's actions are not justified by valid business reasons or lawful, pro-competitive efficiencies.

98.    Santee Cooper's unreasonable restraint of trade, through the unlawful tying of electric transmission to the purchase of Santee Cooper generated electric power, affects substantial volumes of interstate commerce.

99.    As a direct and proximate result of Santee Cooper's unlawful tying, Santee Cooper has unreasonably limited Century's choice in electric power suppliers, causing significant financial harm to Century and unjust rewards for Santee Cooper.

100.    As a direct and proximate result of Santee Cooper's unlawful tying, Century continues to suffer injury.

101.    Santee Cooper's imposition and enforcement of these requirements is likely to continue if not enjoined.

### REQUESTED RELIEF

Century requests judgment against Santee Cooper as follows:

102.    Determining that Santee Cooper has violated Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act, by virtue of the actions of Santee Cooper described in Count One;

103.    Determining that Santee Cooper has violated Section 2 of the Sherman Act by virtue of the actions of Santee Cooper described in Count Two;

104.    Determining that Santee Cooper has violated S.C. Code Ann. § 39-5-20(a) by virtue of the actions of Santee Cooper described in Count Three;

105.    Determining that Santee Cooper has violated .S.C. Code Ann. § 39–3–10 by virtue of the actions of Santee Cooper described in Count Four;

106.    Pursuant to 15 U.S.C. §15, awarding Century treble the amount of damages it has suffered as a result of Santee Cooper's violations of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, in an amount to be proved at trial,  plus an award to Century of its attorney's fees;

107.    Pursuant to S.C. Code Ann. § 39-5-140(a), awarding Century its attorney fees and treble damages for Santee Cooper's "willful" violation of the UTPA. § 39-5-20(a);

108.    Pursuant to S.C. Code Ann. § 39–3–30, awarding Century damages it has suffered for Santee Cooper's violations of S.C. Code Ann. § 39–3–10;

109.    Granting all appropriate injunctive relief;

110.    Awarding Century its costs of pursuing this action; and

111.    Awarding Century all other relief to which it may appear entitled.

## JURY DEMAND

112.    Century demands a trial by jury of all claims.


Dated:  January 30, 2017                    Respectfully submitted,

                                            /s/ William N. Nettles
                                            William N. Nettles (I.D. # 06586)
                                            Law Office of Bill Nettles
                                            2008 Lincoln St
                                            Columbia, SC, 29201
                                            Tel:  (803) 814-2826
                                            Email: bill@billnettleslaw.com

                                            Joseph A. Ostoyich
                                            William C. Lavery
                                            Jeffrey S. Oliver
                                            Nathan N. Chubb
                                            BAKER BOTTS L.L.P.
                                            The Warner
                                            1299 Pennsylvania Ave., N.W.
                                            Washington, D.C. 20004
                                            Tel: (202-639-7905
                                            Fax: (202) 639-1163
                                            Email: joseph.ostoyich@bakerbotts.com
                                                    william.lavery@bakerbotts.com
                                                    jeffrey.oliver@bakerbotts.com

nathan.chubb@bakerbotts.com

*Attorneys for Plaintiff Century Aluminum of South Carolina, Inc.*