IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Century Aluminum of South Carolina, Inc., ) | Civil Action No. 2:17-274-RMG |
| Plaintiff, ) | |
| v. ) | **ORDER AND OPINION** |
| South Carolina Public Service Authority, ) | |
| Defendant. ) | |

This matter is before the Court on Defendant South Carolina Public Service Authority's ("Santee Cooper") motion to dismiss the complaint. The motion has been fully briefed and, on September 1, 2017, the Court heard oral argument on the motion. After full consideration of the parties' briefs and oral arguments, the Court grants the motion to dismiss for the reasons set forth below.

## I. Background

In 1934, the South Carolina General Assembly established Santee Cooper as a non-profit corporation "to manufacture, produce, generate, transmit, distribute, and sell water power, steam electric power, hydroelectric power, or mechanical power within and without the State of South Carolina." S.C. Code § 58-31-30(A)(8). Santee Cooper sells electricity directly to customers and wholesale to South Carolina's twenty retail electric cooperatives through the Central Electric Power Cooperative ("Central"). *See* Santee Cooper, 2016 Annual Report 14, 17 (2016), https://www.santeecooper.com/About-Santee-Cooper/Communications/2016AnnualReport.aspx. A twelve-person board of directors governs Santee Cooper. Each director is appointed for a term of seven years by the Governor, with the advice and consent of the Senate. S.C. Code § 58-31-20. Santee Cooper distributes any excess revenue from its operations to the general funds of the South

Carolina treasury. S.C. Code § 58-31-110. Otherwise, Santee Cooper is financially independent of the state. (Dkt. No. 1 ¶¶ 29–30.) Its budget and the rates it charges customers are not subject to the approval of any state agency. (*Id.*)

In 1974, the General Assembly established a service area for Santee Cooper comprised of portions of Horry County, Georgetown County, and Berkeley County. S.C. Code § 58-31-330. In 1979, an aluminum smelting facility, now owned by Plaintiff Century Aluminum of South Carolina ("Century"), opened in Mount Holly, South Carolina, which is in Berkeley County and within Santee Cooper's service area. (Dkt. No. 1 ¶¶ 1, 18, 32.) An electrolytic process is used to smelt aluminum and electricity is the most costly input for aluminum production. (*See id.* ¶¶ 1, 34.) Then, in 1984, the General Assembly granted the Santee Cooper a monopoly in its service territory, mandating that Santee Cooper's service area "must be exclusively served by the Public Service Authority" (with certain exceptions). S.C. Code § 58-31-430. The rates Santee Cooper charges in its service area are exempt from the oversight of the South Carolina Public Service Commission, which regulates rates charged by investor-owned South Carolina electricity providers. (Dkt. No. 1 ¶ 31.) Additionally, Santee Cooper owns the electricity transmission lines in its service area. (*Id.* ¶ 2.) Other electricity providers cannot provide electricity to customers in the Santee Cooper service area without use of Santee Cooper's transmission lines. (*Id.* ¶ 4.)

Century alleges Santee Cooper leverages its statutory monopoly to force Century to purchase 25% of its electricity from Santee Cooper at supra-competitive prices, even though many third-party suppliers are able and willing to supply that electricity at a lower cost. (*Id.* ¶¶ 37, 52, 64.) Century also alleges Santee Cooper's transmission lines have existing, unreserved import capacity adequate for Century to purchase all of its electricity from third-party providers without additional construction of transmission lines and without disruption of electric service to other

customers. (*Id.* ¶¶ 5, 10.) According to Century, the supra-competitive prices Santee Cooper forces Century to pay are the highest electricity costs for any aluminum smelter in the United States, forcing Century to cut production at the Mount Holly facility by 50% and threatening the facility's complete closure. (*See id.* ¶¶ 6, 7, 9.)

On January 27, 2017, Century filed the present suit, asserting various antitrust claims against Santee Cooper. (Dkt. No. 1.) Century alleges Santee Cooper has unlawfully tied transmission services for non-Santee Cooper electric power to the purchase of electricity from Santee Cooper at supra-competitive rates, in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. *See* 15 U.S.C. § 1, 2, 14. Century alleges Santee Cooper illegally uses its transmission grid as an essential facility to maintain monopoly power in violation of Section 2 of the Sherman Act. Century also alleges Santee Cooper's conduct violates the South Carolina Unfair Trade Practices Act and the South Carolina Antitrust Act ("SCUPTA").

On March 14, 2017, Santee Cooper moved to dismiss the complaint, arguing that it is immune from antitrust claims under the state-action immunity doctrine. (Dkt. No. 11.) Santee Cooper also argues that sale of electricity to end-users and the transmission of electricity to end-users are not distinct antitrust markets in South Carolina, foreclosing any claim of illegal tying, and that the South Carolina Unfair Trade Practice Act does not apply to public entities. Century responded on April 11, 2017 and the Court heard oral argument on the motion on September 1, 2017.

## II.  **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses. . . . Our inquiry then is limited to whether the

allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (quotation marks and citation omitted). In a Rule 12(b)(6) motion, the Court is obligated to "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). However, while the Court must accept the facts in a light most favorable to the non-moving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. Discussion

#### A. Federal Antitrust Claims

Section 1 of the Sherman Act prohibits agreements in restraint of trade. It has two elements. First, a Section 1 violation is an agreement or concerted action by multiple parties. A single party cannot violate Section 1 through unilateral action. Second, the restraint of trade must be illegal. Not all agreements in restraint of trade are illegal. Courts distinguish between legal and illegal restraints of trade using the "Rule of Reason." *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911). Illegal restraints are those that are "unreasonably restrictive of competitive conditions."

Section 2 prohibits unilateral anticompetitive conduct. It does not prohibit monopolies, but rather prohibits achieving or maintaining a monopoly through wrongful conduct. Attempted achievement or maintenance of a monopoly through wrongful conduct is also prohibited if done with a specific intent to monopolize and there is a dangerous probability of success. The elements of a Section 2 claim are (1) possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power as distinguished from growth or development because of superior product, business acumen, or historical accident (*i.e.*, through wrongful conduct). *See United States v. Grinnel Corp.*, 384 U.S. 563, 570–71 (1966). The relevant market is the scope of products and services included in the market (typically, products and services that are market substitutes) and the geographic area in which competition occurs. Monopoly power is the power to control prices or exclude competition in the relevant market.

Century alleges two types of antitrust claims: tying and essential facilities. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different product." *N. Pac. Ry. Co.*, 356 U.S. at 5–6. A tying claim requires at least two separate products. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 20–21 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Tying arrangements are forbidden by Section 3 of the Clayton Act, and they may violate Section 1 or Section 2 of the Sherman Act. 15 U.S.C. § 14. The elements of a tying claim are (1) two separate products or services, (2) the sale of one product (the tying product) is conditioned on the purchase of the other (the tied product), (3) the seller has sufficient market power to restrain trade in the tied product, and (4) a not insubstantial amount of interstate commerce is affected. *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 498–99 (1969). The tying alleged here is transmission service or "wheeling" and electric service. "Wheeling" refers to transfer of electric

power through transmission and distribution lines from one utility's service area to another. Century alleges Santee Cooper requires it to purchase electric service at a supra-competitive rate as a condition for purchasing the service of wheeling power from out-of-state utilities—that access to the Santee Cooper transmission grid is a service "tied" to the sale of Santee Cooper-supplied electricity.

Century also asserts an essential facility claim. A monopolist's refusal to provide access to an essential facility may violate the Sherman Act. *See Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) (holding an electrical utility which sold electricity at both the retail level and the wholesale level had monopolized in violation of the Sherman Act by refusing to supply electricity at wholesale so that it could instead service customers directly itself); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) (holding the only local business circulating news and advertisements in the town violated the Sherman Act by refusing to accept advertising from businesses that placed advertisements with a small radio station); *Associated Press v. United States*, 326 U.S. 1 (1945) (holding the Associated Press bylaws violated the Sherman Act by limiting membership in the organization and thereby access to its copyrighted news services); *United States v. Terminal R. R. Ass'n of St. Louis*, 224 U.S. 383 (1912) (holding denial of use of all railway bridges and switching yards into and out of St. Louis was an illegal restraint of trade and attempt to monopolize). The elements of an essential facilities claim are (1) control of the essential facility by the monopolist, (2) inability practically to duplicate the essential facility, (3) denial of use of the essential facility, and (4) feasibility of providing the facility. *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990) (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983)). Century alleges the transmission and distribution lines surrounding its Mount Holly facility are an essential facility

controlled by the monopolist Santee Cooper, that Century cannot practically duplicate that facility, and that it is feasible for Santee Cooper to provide the facility (*i.e.*, it has the necessary unreserved transmission capacity).

Santee Cooper contests the legal sufficiency of Century's antitrust claims on the merits. But the principal issue before the Court is Santee Cooper's claim of immunity under the state-action immunity doctrine. Because the Court holds Santee Cooper does enjoy immunity under that doctrine, it does not reach the merits of Century's antitrust claims.

**1.** *State-action immunity doctrine*

The state-action immunity doctrine was first recognized in *Parker v. Brown*, 317 U.S. 341 (1943). In *Parker*, California devised a program to regulate the quantity and price of raisins sold. 317 U.S. at 346–47. The scheme was challenged as an antitrust violation by a farmer who would have lost money under the scheme. *Id.* at 348–48. The Supreme Court held California immune from federal antitrust laws, reasoning that states should be able to regulate in the public interest and that the political process is the place to challenge state action. *Id.* at 352.

*Parker* established the well-settled rule that purely private action is subject to antitrust laws and that purely governmental action is immune, but in the subsequent 74 years, the gray area between the two has been heavily litigated. In *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, the Supreme Court held a California statute allowing wine producers to set minimum wine prices was not immune from antitrust scrutiny, even though the basic policy of price maintenance was a clearly articulated state policy. 445 U.S. 97 (1980). The Court held that for state-action immunity to apply to private parties, two conditions had to be met: (1) the challenged restraint must be one clearly articulated and affirmatively expressed as state policy, and (2) the policy must be actively supervised by the state itself. *Id.* at 105. The purpose of the second prong is to make sure private parties are not acting in their own interest rather than the state's

interest. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 45–46 (1985). State-action immunity was unavailable in *Midcal* because prices were set by a private party, the wine producers, and because the state did not review the reasonableness of those prices. The Court pointedly noted, "'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.'" *Midcal*, 445 U.S. at 106 (quoting *Parker*, 317 U.S. at 351); *see also Goldfarb v. Va. State Bar*, 421 U.S. 773, 791 (1975) (holding a state bar's minimum fee schedule violated antitrust laws because "[t]he fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members").

In *Hallie*, the Supreme Court held the second *Midcal* prong generally does not apply to municipalities, because public bodies are presumed to act in the public interest rather than in a private interest. 471 U.S. at 46–47. Municipalities do not require active state supervision because they are electorally accountable, have general regulatory powers, and have no private price-fixing agenda. *See N.C. State Bd. of Dental Examiners v. FTC*, 135 S. Ct. 1101, 1112–13 (2015) (citing *Hallie*, 471 U.S. at 45–47). Acts of those entities therefore are immune if the acts are clearly articulated and affirmatively expressed as state policy. Anticompetitive behavior of municipal actors is clearly articulated and affirmatively expressed as state policy if the anticompetitive effects are foreseeable or "logically would result" from a clearly expressed state policy. *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226, 230 (2013). In *Phoebe Putney*, the Supreme Court clarified that granting a public entity the "general powers routinely conferred by state law upon private corporations" is insufficient to articulate a state policy against competition. *Id.* at 227. In that case, a Georgia law allowing a hospital authority to acquire other hospitals did not permit the authority to make purchases that would violate antitrust laws, because antitrust violations were not

foreseeable or the logical result of a law that merely allowed the hospital authority to "acquire [hospitals] by purchase, lease, or otherwise." *FTC v. Phoebe Putney Health Sys., Inc.*, 663 F.3d 1369, 1377 (11th Cir. 2011), *rev'd*, 568 U.S. 216 (2013).

The Supreme Court's state-action immunity doctrine cases thus create a three-part doctrine: sovereign actors are immune from antitrust laws, public agencies and municipalities created by a sovereign state but not themselves sovereign are subject to the first *Midcal* prong, and private actors acting in the name of the state are subject to both *Midcal* prongs. Until recently, however, there was a circuit split on how to sort entities into those categories by determining whether the entity requires active state supervision. The Second, Fifth, and Tenth Circuits looked to state law, holding that entities are public agencies for antitrust purposes if they are classified as public agencies under state law. *See, e.g., Earles v. State Bd. of CPAs of La.*, 139 F.3d 1033 (5th Cir. 1998); *Porter Testing Lab. v. Bd. of Regents for Okla. Agric. & Mech. Colls.*, 993 F.2d 768 (10th Cir. 1993); *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032 (2d Cir. 1986). The First, Seventh, Ninth, and Eleventh Circuits conducted an analysis of the government-like attributes of the defendant entity, considering a wide range of factors, including open records, tax exemption, lack of possibility of private profit, exercise of governmental functions, rulemaking authority, bonding authority, and composition of the entity's governance structure. *See, e.g., Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293 (11th Cir. 1998); *Hass v. Oregon State Bar*, 883 F.2d 1453 (9th Cir. 1989); *Fuchs v. Rural Elec. Convenience Coop., Inc.*, 858 F.2d 1210 (7th Cir. 1988); *FTC v. Monahan*, 832 F.2d 688 (1st Cir. 1987). The Fourth Circuit adopted the view preferred by the FTC, which was to look at the extent to which the entity is driven by private self-interest. *See N.C. Bd. of Dental Examiners v. FTC*, 717 F.3d 359 (4th Cir. 2013). That approach considers whether the agency has a financial interest

in the restraint that it seeks to enforce and whether the agency is controlled by private market participants who stand to benefit from the restraint. *See id.* at 369. When both factors are present—domination by and accountability to market participants—then both *Midcal* prongs apply.

The Supreme Court granted certiorari in *N.C. Dental* and affirmed the Fourth Circuit's decision, resolving the circuit split. The Court noted,

> In *Ticor* the Court affirmed that *Midcal*'s limits on delegation must ensure that "[a]ctual state involvement, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." 504 U.S. [621, ]633, 112 S. Ct. 2169. And in *Phoebe Putney* the Court observed that *Midcal*'s active supervision requirement, in particular, is an essential condition of state-action immunity when a nonsovereign actor has "an incentive to pursue [its] own self-interest under the guise of implementing state policies." 568 U.S. [216], 133 S. Ct., at 1011 (quoting *Hallie, supra*, at 46–47, 105 S. Ct. 1713). The lesson is clear: *Midcal*'s active supervision test is an essential prerequisite of Parker immunity for any nonsovereign entity—public or private—controlled by active market participants.

*N.C. Dental*, 135 S. Ct. at 1113. The Court also explicitly rejected the argument that entities have immunity simply because they are classified as public agencies under state law: "The Board argues entities designated by the States as agencies are exempt from *Midcal*'s second requirement. That premise, however, cannot be reconciled with the Court's repeated conclusion that the need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade." *Id.* at 1113–14. The Court then clarified that "[w]hile *Hallie* stated 'it is likely that active state supervision would also not be required' for agencies, 471 U.S. at 46, n.10, 105 S. Ct. 1713, the entity there, as was later the case in *Omni*, was an electorally accountable municipality with general regulatory powers and no private price-fixing agenda." *Id.* at 1114.

On the question of whether existing state supervision is adequate supervision, the Court provided,

> The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy, *see ibid.*; and the "mere potential for state supervision is not an adequate substitute for a decision by the State[.]" Further, the state supervisor may not itself be an active market participant. In general, however, the adequacy of supervision otherwise will depend on all the circumstances of a case.

*Id.* at 1116–17 (citations omitted).

Finally, it must be noted that the Supreme Court has repeatedly stated that state-action immunity is disfavored "given the antitrust laws' values of free enterprise and economic competition" and as a repeal by implication. *Ticor*, 504 U.S. at 636; *see also N.C. Dental*, 135 S. Ct. at 1110; *Phoebe Putney*, 568 U.S. at 225.

## 2. *Santee Cooper's immunity claim*

There is no colorable argument that Santee Cooper is a sovereign entity not subject to either *Midcal* prong. In its reply brief, Santee Cooper makes the strained argument that it has "*ipso facto*" immunity from antitrust laws because it is a fully sovereign actor, like a state legislature or a supreme court. (Dkt. No. 18 at 3.) Santee Cooper argues it is fully sovereign because the legislature delegated to Santee Cooper "the sovereign power to make rules to govern the use of its facilities and to set the rates, terms, and conditions of electric service." (*Id.* at 4.) Santee Cooper also argues gubernatorial appointment of its directors, with Senate consent, demonstrates its sovereignty.

Santee Cooper, however, is chartered as a public corporation, like a municipality. S.C. Code § 58-31-10. Municipalities are not fully sovereign actors for antitrust purposes, even though municipalities are granted powers far more closely associated with sovereignty than merely setting the price of one's own products (*i.e.*, police power to keep the peace, power to enact ordinances having criminal penalties, power to impose taxes) and even though they typically are led by

officers selected through popular election. *See N.C. Dental*, 135 S. Ct. at 1114 (noting the logic of Hallie applies to "an electorally accountable municipality with general regulatory powers"). Because Santee Cooper is not fully sovereign, it either is (1) a public agency created by a sovereign state but not itself sovereign, subject to the first *Midcal* prong, or (2) it is a publicly owned entity that for antitrust purposes is a private actor in the marketplace, subject to both *Midcal* prongs.

First, the Court must determine whether the South Carolina legislature has a clearly articulated policy to displace competition. *See Phoebe Putney*, 133 S. Ct. at 1011. If so, the Court must then determine whether *Midcal*'s active supervision prong applies to Santee Cooper (and, if so, whether that prong is satisfied). *N.C. Dental*, 135 S. Ct. at 1113. For the reasons set forth below, the Court holds that South Carolina has a clearly articulated policy to displace competition in Santee Cooper's exclusive service area and that *Midcal*'s active supervision requirement is inapplicable because active market participants do not control Santee Cooper.

a.   *Clearly Articulated Policy*

South Carolina law provides that "[t]he Public Service Commission may not assign any portion of the present service area of the Public Service Authority to any electrical utility or electric cooperative and *this service area must be exclusively served by the Public Service Authority*." S.C. Code § 58-31-430 (emphasis added). Despite that clear statutory text, Century argues Santee Cooper's pricing decisions concerning Century are not part of a clearly articulated state policy because the exact restrictions Santee Cooper imposes on Century are not expressly authorized by statute. But "to pass the 'clear articulation' test," a state legislature need not 'expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects.' Rather . . . state-action immunity applies if the anticompetitive effect was the "foreseeable result" of what the State authorized." *Phoebe Putney*, 568 U.S. at 226–27 (citation omitted). Here, Century merely complains that Santee Cooper prevents Century from purchasing

power from cheaper providers. That result must be a foreseeable result of giving Santee Cooper a monopoly over the area in which Century is located.

Century relies on then-Judge Gorsuch's opinion in *Kay Electric Co-operative v. City of Newkirk, Oklahoma*, 647 F.3d 1039 (10th Cir. 2011), but that case is inapposite. There, a municipality refused to provide sewage service unless the customer also purchased its electricity from the municipality. *Kay Elec. Coop.*, 647 F.3d at 1041. The Tenth Circuit held Oklahoma statutes did not clearly articulate a state policy permitting that species of antitrust violation. *Id.* at 1044. If Santee Cooper had required Century to purchase water in order to get electricity, *Kay* would be relevant, but Santee Cooper merely required Century to purchase some (but not all) of its electricity from Santee Cooper.

Century further argues that Santee Cooper's "exclusive service area" is exclusive only in that "the Public Service Authority shall have the right to furnish electrical service to the exclusion of other electrical utilities" in that area, S.C. Code § 58-31-310(2), but the statute defines "electrical utilities" as entities owning or operating electrical generation or transmission equipment in South Carolina, S.C. Code § 58-31-310(1). Century argues that definition of "electrical utilities" permits Century to purchase electricity from out-of-state utilities. Long-established doctrines of statutory interpretation prevent courts from construing an isolated statutory definition to thwart the purpose of a larger legislative enactment. "When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature . . . .'" *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (quoting *Brown v. Duchesne*, 60 U.S. 183, 194 (1856)). It is implausible the South Carolina legislature meant to

permit unqualified service from out-of-state commercial utilities (including out-of-state subsidiaries of South Carolina utilities) in Santee Cooper's service area when it said, "this service area must be exclusively served by the Public Service Authority."

Certainly, courts do not read language *out* of statutes. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). But a more reasonable explanation for including "in South Carolina" in the definition of an electrical utility for purposes of article 3 of chapter 31 of title 58 of the South Carolina Code is that the purpose of that article is to divide South Carolina into areas Santee Cooper serves and areas other South Carolina utilities serve. The Court declines to read that phrase as an affirmative decision to allow out-of-state utilities the right to compete in Santee Cooper's exclusive service area. *Cf.* Letter from Thomas Jefferson to Judge William Johnson (June 12, 1823), in 15 The Writings of Thomas Jefferson, at 449–50 ("On every question of construction . . . instead of trying what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed.").

Century yet still further argues electricity purchased from out-of-state providers is in a sense self-provided and therefore counts as self-furnished power beyond the scope of Santee Cooper's monopoly. *See* S.C. § 58-31-310 (exempting from the monopoly "a person, corporation furnishing electricity only to himself or itself, their residents, employees or tenants when such electricity is not resold or used by others"). Century argues that if it is in an area that "must be exclusively served by the Public Service Authority" then Santee Cooper should not be able to tie the ability to obtain power from other suppliers to purchases of power from Santee Cooper, because it should not be possible to purchase power from other suppliers at all. (Dkt. No. 17 at 25.)

Whether Santee Cooper has complied with state statutory requirements about electricity provided from out-of-state sources is not an issue before this Court. The issue before this Court is, for purposes of *Midcal*'s clear articulation test, whether the exemption of self-furnished electricity refers only to a customer's own generation capacity, or whether it includes electricity generated by a competing utility company and transmitted over Santee Cooper's transmission lines. The Court concludes the statute by its plain text exempts only customer self-generation, *e.g.*, backup generators, solar panels, or captive power plants. To "furnish" is to provide or supply with something. Furnish, Oxford English Dictionary (2d ed. 1989). If "furnishing electricity" in "a person, corporation furnishing electricity only to himself or itself, their residents, employees or tenants when such electricity is not resold or used by others" is taken to include the purchase of electricity from an electric utility, then every entity that purchases electricity would be "furnishing electricity" for itself, so that the self-furnished power exemption from Santee Cooper's monopoly would entirely swallow the monopoly. Of course, Century maintains that for present purposes "electric utility" means only utilities with generation or transmission lines in South Carolina, so that an entity is "furnishing electricity" for itself only if it purchases from an out-of-state utility. But this Court finds it obvious that "furnishing electricity only to himself or itself . . . when such electricity is not resold or used by others" was not meant to require Santee Cooper to make its transmission lines available for retail wheeling within Santee Cooper's exclusive service area.

The only reasonable construction of the South Carolina law providing that Santee Cooper's service area "must be exclusively served by" Santee Cooper is that it is South Carolina's policy for Santee Cooper to have monopoly power in that service area. Santee Cooper's monopoly power in its exclusive service area therefore is the clearly articulated and affirmatively expressed policy of South Carolina.

*b.     Active Supervision*

Santee Cooper is a corporation "completely owned by and to be operated for the benefit of the people of this State." S.C. Code § 58-31-110. Santee Cooper was created "for the benefit of all the people of the State, for the improvement of their health and welfare and material prosperity, and are public purposes." S.C. Code § 58-31-80. It is governed by a board of directors appointed for fixed seven-year terms and who are removable only for cause. *See* S.C. Code § 58-31-20. One member is appointed from each congressional district. *Id.* One member each must reside in the service counties of Horry, Berkeley and Georgetown Counties and must be customers of Santee Cooper. *Id.* Two members, including the chair, are selected at large. *Id.* No more than two residents of any county can serve on the board at any one time. *Id.* Two of the board members must have substantial experience with electric cooperatives and one of those must be from an elective cooperative that transmits or generates electricity. However, no employee or board member of an elective cooperative can serve on the board of Santee Cooper. *Id.* Board members' compensation is set by an advisory board comprised of the Governor, Attorney General, State Treasurer, Comptroller General, and Secretary of State. S.C. Code § 58-31-20(D).

The board of directors governs Santee Cooper's business operations without supervision from any electorally accountable person or body. The board members are required by statute to balance the preservation of the financial integrity of the agency, the economic development and job attraction and retention within Santee Cooper's service area, and "good business practices." S.C. Code § 58-31-55. The only restriction on the board of directors' authority to conduct Santee Cooper's business is that the board may not wind up Santee Cooper's business or dispose of its core assets without legislative approval. S.C. Code § 58-31-20(B). South Carolina is not responsible for Santee Cooper's debts. *See* S.C. Code § 58-31-30(A).

The purpose of the second *Midcal* prong "is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634–35. A regulatory board controlled by persons with a private interest in the market being regulated is subject to the second prong of *Midcal*. *N.C. Dental*, 135 S. Ct. at 1113–14. But where the actor is a municipality, "the active state supervision requirement should not be imposed" because "there is little or no danger that it is involved in a *private* price-fixing arrangement." *Hallie*, 471 U.S. at 46–47.

Thus, as a public corporation or municipality, Santee Cooper requires active state supervision for antitrust immunity only if it is controlled by active market participants. *See N.C. Dental*, 135 S. Ct. at 1113; *Phoebe Putney*, 133 S. Ct. at 2256. The complaint fails to allege that Santee Cooper is controlled by active market participants. Moreover, the statutes governing Santee Cooper's board of directors prevent board members from having private interests in the electric utility marketplace. Board members are political appointees chosen from across South Carolina. S.C. Code § 58-31-20. Candidates must be screened by the South Carolina Senate's State Regulation of Public Utilities Review Committee before they may be appointed. *Id.* Board members' compensation is set by senior elected state officials, not by marketplace actors, and board members have no equity interest in Santee Cooper. *Id.*

Perhaps most importantly, Santee Cooper board members are subject to a statutory best interest test that requires them to balance Santee Cooper's proprietary interests with the public's interest in economic development and job retention. Century alleges there is "no relevant difference between Santee Cooper's structure and governance and other private entities governed by a board of directors." (Dkt. No. 1 ¶ 31.) But a director of a private corporation exclusively acts

"in a manner he reasonably believes to be in the best interests of the corporation and its shareholders." *See* S.C. Code § 33-8-300. Santee Cooper directors, on the other hand, are required to balance Santee Cooper's financial interests against economic development and job retention in the service area, S.C. Code § 58-31-55, a point Century itself acknowledges in its complaint. (*See* Dkt. No. 1 ¶ 14 ("Santee Cooper's Board of Directors is expressly directed by S.C. Code Ann. § 58-31-55(A) to consider the effect its decisions would have on 'job attraction and retention' in Santee Cooper's service area").)

Instead of alleging that active market participants control Santee Cooper, Century complains that Santee Cooper's board has "limited expertise," "no internal Santee Cooper staff or outside experts directly advis[ing] the Board," and that the board "relies wholly on management." (*Id.* ¶ 31). But the effectiveness of Santee Cooper's board of directors is not an issue before this Court. The issue is the legal standard controlling federal antitrust claims against state entities, which requires Century to show Santee Cooper is controlled by active participants in the electricity market yet is not subject to active state supervision. *See N.C. Dental*, 135 S. Ct. at 1112–14. Century does not allege that Santee Cooper is controlled by active market participants, and, as a matter of law, active market participants do not control Santee Cooper. The Court therefore holds that Santee Cooper enjoys state-action immunity from antitrust claims without satisfying *Midcal*'s active state supervision test, and grants Santee Cooper's motion to dismiss Century's federal antitrust claims. Because the Court holds Santee Cooper is immune from antitrust claims, it does not reach arguments about the merits of Century's antitrust claims.

## B. South Carolina Antitrust Claims

Analysis of South Carolina antitrust claims is inseparable from analysis of federal antitrust claims. "Because South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement . . . analysis of . . . claims under federal

antitrust law is equally dispositive of state law claims." *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987) (internal quotation marks omitted); *see also Welchin v. Tenet Healthcare Corp.*, 366 F. Supp. 2d 338, 342 (D.S.C. 2005) ("[A F]inding with respect to liability on Plaintiff's federal antitrust claims will be dispositive of the state law antitrust claim."). Because the Court dismisses Century's federal antitrust claims, it also dismisses Century's South Carolina antitrust claims.

## C. South Carolina Unfair Trade Practices Act Claims

"To recover in an action under the [SC]UTPA, the plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected [the] public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s). An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive. An act is 'deceptive' when it has a tendency to deceive." *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 743 S.E.2d 808, 816 (S.C. 2013) (citations omitted). SCUTPA parties must be persons, defined as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity." S.C. Cod § 39-5-10(a). The statute has a regulatory exemption that provides "the SCUTPA does not apply to [a]ctions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of this State or the United States or actions or transactions permitted by any other South Carolina State law." *Id.* at 816 n.13 (internal quotation marks omitted).

Santee Cooper argues, among other arguments, that the regulatory exemption bars Century' SCUTPA claims. The Court agrees. The regulatory exemption applies to transactions "allowed or authorized by regulatory agencies or other statutes." State law requires Santee Cooper to provide exclusive electric service to Century and to set the rates for that service. *See* S.C. Code

§§ 58-31-30(A)(13), 58-31-80, 58-31-55(A)(3)(a), 58-31-430. The South Carolina Court of Appeals rejected a claim against the City of Columbia that the city's policy of charging non-residents a higher rate for water violated SCUTPA because state statutes allowed the city to set rates for services provided outside its corporate limits. *Calcaterra*, 432 S.E.2d at 499–500. Similarly, here, Century challenges the price a public corporation charges for services where a statute allows that corporation to provide exclusive services and to set rates. The only thing allegedly unfair about the rates charged is that they are higher than rates offered by other utilities. "An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive." *Health Promotion Specialists*, 743 S.E.2d at 816. Santee Cooper's rates are not "immoral, unethical, or oppressive" because they are higher than some other utility's rates and because Century must pay those rates as it is within Santee Cooper's statutory area of exclusive service. The SCUTPA claims therefore are dismissed.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Santee Cooper's motion to dismiss (Dkt. No. 11).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

October 4, 2017
Charleston, South Carolina